UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOY ROBERTSON, | : | |
| *Plaintiff*, | : | CIVIL CASE NUMBER: |
| | : | |
| v. | : | 3:14-CV-01861 (VLB) |
| | : | |
| WELLS FARGO BANK, N.A., | : | January 23, 2017 |
| *Defendant*. | : | |

### MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 52]

Before the Court are Joy Robertson's ("Robertson" or "Plaintiff") claims for race and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), for race and gender discrimination in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq.* ("CFEPA"), and for retaliation in violation of CFEPA. Defendant Wells Fargo Bank, N.A. ("Wells Fargo") filed a Motion for Summary Judgment as to the Second Amended Complaint on July 1, 2016. [Dkt. 52 (Def.'s Mot. Summ. J.)]. The motion is now fully briefed. For the following reasons, the Court GRANTS the Defendant's Motion for Summary Judgment.

I.     Facts

a.  *The Parties*

Wells Fargo is a nationwide, diversified financial services company that provides banking, insurance, investments, mortgage, and consumer and commercial financial services. [Dkt. 54 (Def.'s Local Rule 56(a)(1) Statement), ¶ 1; Dkt. 66 (Pl.'s Amended Local Rule 56(a)(2) Statement), ¶ 1].

Plaintiff Joy Robertson is a black woman who was born in Jamaica, grew up in Canada, and moved to the United States in or about 1990.  [Dkt. 54, ¶ 34; Dkt. 66, ¶ 34].  In approximately July 2010 Robertson became a Service Manager in the Wells Fargo store located in Prospect, Connecticut.  [Dkt. 54, ¶ 35; Dkt. 66, ¶ 35].  As a Service Manager, Robertson was in charge of the tellers at her store, which included the responsibility of ensuring tellers complied with Wells Fargo policies and procedures.  [Dkt. 54, ¶¶ 42, 45; Dkt. 66, ¶¶ 42, 45].  Robertson spent more than 50% of her working hours "performing on the teller line."  [Dkt. 66-3, (Pl.'s Amended Local Rule 56(a)(2) Statement Ex. 3, Robertson Aff.), ¶ 12].

From approximately September 2011 until her termination on December 6, 2013, Robertson reported directly to Prospect Store Manager Mamta Dhir ("Dhir"), who is an Asian American (Indian) woman.  [Dkt. 54, ¶¶ 36-37; Dkt. 66, ¶¶ 36-37].  From approximately March 2013 until her termination, Robertson reported to District Manager Jeffrey Bruneau ("Bruneau") indirectly.  Bruneau is a white man.  [Dkt. 54, ¶ 38; Dkt. 66, ¶ 38; Dkt. 54-5 (Ex. 5, Def.'s Obj. and Supp. Interrog.), at 5].  His predecessor was Cinda Bertsos ("Bertsos"), a white woman, who transferred to the Wells Fargo Quinnipiac Shoreline District at the end of 2012.  [Dkt. 54, ¶¶ 39-40; Dkt. 66, ¶¶ 39-40; Dkt. 54-5, at 5].

b. *Policies and Procedures*

Wells Fargo maintains several policies and procedures in the January 2013 Wells Fargo Team Member Handbook ("2013 Handbook"), which includes the following: Diversity and Inclusion policy; Affirmative Action, EEO, & Diversity policy; Nonretaliation policy; various anti-harassment policies; and a Dispute

Resolution policy.  [*See generally*, Dkt. 54-2 (Ex. 2, Handbook, January 2013)].
The 2013 Handbook explicitly sets forth its policy on hiring employees: "Our
policy is that we do not discriminate on the basis of race, color, gender, national
origin, religion, age, sexual orientation, gender identity, genetic information,
physical or mental disability, pregnancy, marital status, veteran status, or any
other status protected by federal, state or local law."  [*Id.* at WF000029].  The 2013
Handbook directs employees to contact Human Resources when the employee
"need[s] advice or help in solving an issue that [he or she] ha[s] on the job."  [*Id.*
at WF000008].  Should the employee have a dispute, he or she is advised to first
resolve the issue with the direct manager, or if the dispute cannot be resolved to
then seek out and follow the Dispute Resolution Resources referenced in the
2013 Handbook.  [*Id.* at WF 000046].

Wells Fargo also maintains a Code of Ethics & Business Conduct ("Code")
that can be found within the 2013 Handbook.  [*Id.* at WF000014].  The Code states,
"*Important: You're responsible for complying with the provisions of the Code and
reporting any conflicts of interest or other violations of the Code to the
appropriate person.  Violations of the Code or refusal to complete the Team
Member Acknowledgment are grounds for corrective action, which may include
termination of your employment*."  [*Id.* (emphasis added)].  The Code also
requires employees to adhere to the following with respect to accurate records:

> You are responsible for preparing and maintaining accurate records
> to the best of your knowledge and retaining business records in
> compliance with applicable regulations, law, and Wells Fargo's
> record retention policies.  All business transactions, including team
> member expense reporting, must be properly and accurately
> recorded in a timely manner on Wells Fargo's books and records and

**in accordance with applicable accounting standards, legal requirements, and Wells Fargo's system of internal controls. <u>Falsification of any company or personal information that you provide is prohibited.  Falsification refers to knowingly misstating, altering, adding information to, or omitting or deleting information from a Wells Fargo record or system which results in something that is untrue, fraudulent, or misleading.</u>**

[*Id.* at WL000019 (emphasis added)].  "Gaming is defined as the manipulation, misrepresentation, or both or sales or sales reporting in an attempt to receive compensation or to meet sales goals."  [*Id.* at WF000020].  Gaming "to receive compensation, to meet sales goals, or for any other reasons is in direct violation of the company policy and this Code."  [*Id.*].  The Code expressly lists "sales referrals" as one situation where issues of gaming may arise.  [*See id.*].

The Code states that only valid sales referrals may be submitted to meet sales goals or receive credit under sales referral programs.  [*Id.*].  It also specifies what constitutes a valid sales referral.  "Valid referrals typically require team members to have spoken directly with the customer about a specific product or a referral to a different business unit <u>and</u> to have gained the customer's agreement for that product or referral."  [*Id.*].  The provision holds the employee responsible for knowing the terms of the sales incentive program applicable to that business unit.  [*Id.*].

A different document, the Wells Fargo Sales Quality Manual lists examples of appropriate and inappropriate conduct regarding the submission of referrals.  Examples of appropriate conduct are:

- "A teller referring a customer to a personal banker after uncovering a need for a product or service and gaining agreement from the customer to meet with the personal banker to discuss the product or service further."

- "A teller receiving referral credit when a product or service is sold to a customer based on the outcome of a Service Signal."

- "A teller receiving referral credit when a product or service is sold after referring a customer to a personal banker for a 'financial review' or 'financial checkup.'"

[Dkt. 54-4 (Def.'s Local Rule 56(a)(1) Statement Ex. 4, Sales Quality Manual) at WF000080].  The Sales Quality Manual also lists several examples of improper conduct, some of which include:

- "Submitting a referral after directing a customer who came into the store with the intent to purchase a product or service, even if other products or services are discussed before the customer is directed to the banker."

- "Bankers supplying tellers with customer information to input as a referral when the teller did not have any contact with the customer."

- "Resubmitting a referral without having an additional sales conversation and without regaining consent from the customer."

[*Id.*].  District Manager Bruneau calls a situation "when a teller is given contribution credit for a referral that was not the result of him or her uncovering a customer's potential need for a financial product or service, such as when a sale is made and the referral credit is simply given to a teller who had no contact

whatsoever with [the] customer," an "underlined referral." [Dkt. 54-1 (Def.'s Local Rule 56(a)(1) Statement Ex. 1, Bruneau Aff.) ¶ 11].

Robertson acknowledges that she was responsible for complying with Wells Fargo policies and procedures and that it was important that only valid sales referrals were submitted, because it "keeps everyone accountable and helps the store to run efficiently" and "because you don't want everyone to run off and do their own thing, so you abide by the guidelines given to you." [Dkt. 54-3 (Def.'s Local Rule 56(a)(1) Statement Ex. 3, Robertson Dep.) at 37:25-38:12]. She admits to being responsible for ensuring Wells Fargo business records were accurate, knowing the terms of her business unit's sales and incentive programs, and ensuring that tellers completed prompt and efficient transactions. [Dkt. 54, ¶¶48-49; Dkt. 66, ¶¶ 48-49; see Dkt. 54-3, at 24:1-12]. Robertson believes it was important for a Service Manager to "exemplify the highest standards of ethical behavior" because, "in [her] opinion, that is important because you are dealing with the customers, and you want your customers to trust you in every way. So the higher the standard that you hold yourself to is, you know, better for you and for the business that you are working for." [Dkt. 54-3, at 43:13-23]. She also stated that a "service manager is an example for the team" and further articulated, "I believe that the business must operate according to the ethical principles that you hold yourself to. In that sense the way in which you work is no more important than the ethics by which you operate." [*Id.* at 44:3-23].

As a Service Manager, it was her role to ensure sales credit was awarded to the team member who actually made the sale and to review referral sales to

mitigate potential integrity violations.  [*Id.* at 55:20-25, 70:15-21].   Robertson acknowledges it is inappropriate for a team member to enter a sale and assign it to another team member who did not make the sale.  [Dkt. 54, ¶ 58; Dkt. 66, ¶ 58]. Robertson understands that manipulated or misrepresented referrals are a Wells Fargo sales integrity violation as is "gaming" the sales incentive program.  [Dkt. 54-3, at 54:9-13; Dkt. 54 ¶ 60; Dkt. 66 ¶ 60].  Robertson states, however, that she was not aware that entering false sales or false referrals in the tracking system could result in her immediate termination, and she reasoned, "[S]ome of these that I am seeing were not in the original handbook I saw.  I don't remember seeing this specific one that says entering false sales or referrals on a tracking system – ."  [Dkt. 54-3, at 49:18-54:3; *but see* 51:15-23 (where Robertson acknowledged she knew her employment could be terminated if she was aware of her involvement in entering false sales or referrals into the tracking system)].

Robertson also testified that managers routinely incentivized tellers in ways which did not comport with the written policy.  [Dkt. 54-3, at 58:12-15]. Several former employees at Wells Fargo submitted affidavits declaring that it was a routine practice to share "unearned referrals."  For example, Michele Bonacassio, a Service Manager at Wells Fargo for 12 years, stated, "It was NOT an uncommon practice to give my tellers referrals from which I had earned by speaking to customers . . . . If I received referrals personally, then I would pass them onto my tellers equally, working together as a team." [Dkt. 66-13 (Pl.'s Amended Local Rule 56(a)(2) Statement Ex. 12, Bonacassio Aff.)].  Several other former Wells Fargo employees submitted affidavits attesting to similar conduct.

[*See, e.g.*, Dkt. 66-5 (Pl.'s Amended Local Rule 56(a)(2) Statement Ex. 4, Soricelli Aff.) ("As a practice to show good team work any who made their sales goal for the month who wanted to give their referrals to another team member who had not made their goal was allowed to do so."); Dkt. 66-6 (Pl.'s Amended Local Rule 56(a)(2) Statement Ex. 5, Fernandez Aff.) ("The teller should never send that referral unless the teller offers the product that is in the green box, but in many cases that is not what happens due to the pressure of sales."); Dkt. 66-7 (Pl.'s Amended Local Rule 56(a)(2) Statement Ex. 6, Morassini Aff.) ("[I]t was a regular practice that after any associate had reached their personal sales goal, we were allowed to give our referrals to others that had not yet reached their sales goal.")].   Waterbury Service Manager, Janet Smith, even noted that team members would talk about referrals at "morning huddle" meeting and "wrap-up" sessions, wherein they "discussed which team members had enough refers [sic], and which team members needed referrals to meet their goals.   All of the team members, including the store manager, discussed sharing referrals. Sharing referrals among team members was not done in order to obtain a promotion or incentives, but to maintain morale among the team that was working very hard every day."   [Dkt. 66-11 (Pl.'s Amended Local Rule 56(a)(2) Statement Ex. 10, Smith Aff.), ¶7].   There is no evidence on the record that these practices comported with any Wells Fargo corporate policy.

Although Smith averred that sharing referrals among team members was not done to obtain a promotion or incentive, Robertson stood to reap promotional and financial benefits from the routine systematic practice of sharing referrals,

because part of her performance evaluation and compensation were based on teller contributions. [Dkt. 54, ¶¶ 63-64; Dkt. 66, ¶¶ 63-64]. Robertson became eligible for a "coach's bonus" (i.e. an additional 15% of her quarterly incentive compensation) based, in part, on teller contributions. [Dkt. 54, ¶ 65; Dkt. 66, ¶ 65].

     c. *Referrals and Employment Termination*

In mid-2013, the Employee Relations Department learned through an unrelated investigation that tellers in the Prospect Store were submitting "unearned referrals." [Dkt. 54-10 (Def.'s Local Rule 56(a)(1) Statement Ex. 10, Kent Aff.), ¶¶ 3-4]. In September 2013, Dhir called the EthicsLine and identified Robertson as one of the employees who gave tellers unearned referrals. [Dkt. 54, ¶ 68; Dkt. 66, ¶ 68].[1] Victor Alexander ("Alexander"), an Investigator in the Corporate Investigations Department, conducted an investigation of the tip. As part of his investigation, he interviewed Robertson and elicited her statement. Robertson handwritten statement submitted on October 30, 2013, states,

> Mamta [Dhir] and I came to what I believe was a feasible solution that if a teller had six or more warm hand offs in a day and the bankers did not uncover or closed [sic] those deal [sic] that we could give them a referral that I or Mamta uncover [sic] to encourage them to keep referring after speaking with Jeff [Bruneau] in either August or September he told me not to encourage that behavior and that has not been [sic] practice since." [Dkt. 54-13 (Def.'s Local Rule 56(a)(1) Statement Ex. 13, Pl.'s Handwritten Statement); Dkt. 54, ¶ 72; Dkt. 66, ¶ 72].

Robertson admits to violating Wells Fargo's referral policy by giving tellers some referrals she earned on a few occasions. [Dkt. 54, ¶ 73; Dkt. 66, ¶ 73]. At some point in early September, Robertson notified Bruneau of the above actions. [Dkt.

---

[1] Dhir and Robertson had a tense working relationship, which ultimately required Bruneau's intervention. [*See* Dkt. 54, ¶¶ 76-77; Dkt. 66, ¶¶ 76-77].

54-3, 146:14-147:7; *see* Dkt. 66-8 (Pl.'s Amended Local Rule 56(a)(2) Statement Ex. 7, Alexander Investigation Notes), at WF000176].   Bruneau responded, "Don't entertain that behavior; they will get used to it," but Robertson maintains "he never said it was illegal or you could be fired or you can lose your job right now." [Dkt. 54-3, at 147:8-13].   Her actions subsequently stopped and Bruneau did not report the incident.   [Dkt. 54-15 (Def.'s Local Rule 56(a)(1) Statement Ex. 15, Kent HRA Notes), at WF000122; Dkt. 66-8, at WF000176].

During an interview on November 4, 2013, Dhir submitted a handwritten statement wherein she stated that Robertson and tellers were complaining that they had five or six "walkover" a day to the personal banker, but they would not get any referrals from that day.   [Dkt. 54-14 (Def.'s Local Rule 56(a)(1) Statement Ex. 14, Dhir Handwritten Statement), at WF000205].   As a solution, Robertson suggested they "give them something once in a while" if tellers were trying hard consistent with five or six "walkovers." [*Id.*].   Dhir agreed to the suggestion in order to boost teller morale, also stating that "people need to hold themselves accountable" and "not blam[e] management."   [*Id.* at WF000206].

On November 5, 2013, Alexander presented his findings to Employee Relations Consultant Jennifer Kent ("Kent"), Human Resources Partner Ryan Muir ("Muir"), Region President Joseph Kirk ("Kirk") and Bruneau.   [Dkt. 54-1, ¶ 28; Dkt. 54-10, ¶ 6; Dkt. 54-15, at WF000122].   Kirk and Bruneau expressed their preference for a written warning, but Kent believed such conduct warranted termination.   [Dkt. 54, ¶¶ 84-85; Dkt. 66, ¶¶ 84-85].   Kent's cryptic notes from the meeting indicate Kirk "looks at this from legal and for [the] dollars he gets

charged for a wrongful termination.  Joe said he's concerned that we go from 0-60[.] [I]f we coach a manager and the behavio[]r stops….why then are we at term[ination]?"  [Dkt. 54-15, at WF000125].  Kirk also believed that "if improper interpretation of policy and that behavior stops…and it meets the test [that] this was not [done] for gain [Robertson should not be terminated]. . . ." [*Id.*].

The next day, Kent held a conference call with her supervisor, Employee Relations Manager Anne Cox ("Cox"), and Alexander.  [Dkt. 54, ¶ 86; Dkt. 66, ¶ 86].  After discussing Alexander's findings, Kent and Cox concluded Robertson and Dhir should be terminated.  [Dkt. 54-10, ¶¶ 7, 14-15; Dkt. 54-16 (Def.'s Local Rule 56(a)(1) Statement Ex. 16, Cox Aff.), ¶ 5].[2]  Specifically, Kent noted on November 6, 2013, that "Joy, SM – upto [sic] date on training, teller training and sm [sic] training and familiar with the sales quality manual.  Joy admitted that she had given some tellers referrals in the past where tellers would get an unearned referral that we could give them a referral that stmg [sic] or I uncovered to keep the tellers encourages.  falsification."  [Dkt. 54-15, at WF000126].  Robertson maintains, however, that she did not falsify sales referrals because she did not enter the sales referrals in the sales tracking systems; rather, the tellers entered such actions.  [Dkt. 66-3, ¶ 11].  Denise Dennis, who processed Robertson's request for termination review, confirms that Robertson's handwritten statement

---

[2] Plaintiff disputes that Kent and Cox made the determination and refers to documents never submitted to the Court.  As the Court cannot consider any allegations not supported by evidence, the Court cannot entertain Plaintiff's claim on this issue.  *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. . . .").

did not admit to falsifying sales referrals.  [Dkt. 66-12, (Pl.'s Amended Local Rule 56(a)(2) Statement Ex. 11, Dennis Dep.), at 150:23-151:3].  She also noted that Bruneau felt "Vic [Alexander] went too far," although she does not recall why he felt that way.  [*Id.* at 176:8-21].

Kent and Cox decided to issue written warnings only to certain tellers who received unearned referrals because they were following the plan of their supervisors Dhir and Robertson.  [Dkt. 54-10, ¶ 18; Dkt. 54-15, at WF000126; Dkt. 54-16, ¶ 9].[3]  These three employees were two white women and one (racially unidentified) man.  [Dkt. 66-3, ¶ 12].

Both attest that they did not know Robertson's race when they made the termination decisions.  [Dkt. 54-10, ¶ 16; Dkt. 54-16; ¶ 7].  Evidence shows that they were however aware of Robertson's gender and age.  Specifically, Kent wrote in her notes,

> Jeff says he wants to add this…both the [Store Manager] and [Service Manager] have called HRA and both are over 40.  I said I hear you, and agree we need to look always at risk… but in this case, as leaders you need to know how to lead your team and saying you don't know what a valid referral is…I'm not buying.  Clearly as a manager you have the bankers reporting to you so you should know what ethical sales is.

[Dkt. 54-15, at WF000125].   Under Kent's direction, Bruneau terminated Robertson's employment on December 6, 2013.  [Dkt. 54, ¶ 92; Dkt. 66, ¶ 92].

---

[3] Robertson claims Ms. Coma was a personal banker and Kent and Cox describe her as a teller.  [*See* Dkt. 54-10, ¶ 18; Dkt. 54-16, ¶ 9; Dkt. 66 (Statement of Disputed Facts), ¶ 35].  The record does not state Coma's job status at the time she committed the violation(s), but it does establish that at some undisclosed point Coma was promoted to be a personal banker.  [Dkt. 54-15, at WF000126].  Regardless, Kent and Cox identified Coma's status as a teller and determined she acted under Robertson's supervision at that time. [Dkt. 54-10, ¶ 18; Dkt. 54-16, ¶ 9].  The Court will thus refer to Coma as a teller.

Bruneau selected as her replacement Varsha Mathur, a Sales Manager from another district who identifies as an Asian American (Indian) woman.  [Dkt. 54, ¶¶ 93-94; Dkt. 66, ¶¶ 93-94].

From January 2012 onward, Wells Fargo terminated the employment of two Store Managers and three Service Managers in Connecticut for misconduct relating to "unearned referrals": (1) Dhir, an Asian American (Indian) woman; (2) Nathan Sherwood, a white man; (3) Robertson, a black woman; (4) Janet Smith, a black woman; (5) and Monika Malhotra, a Hispanic woman.  [Dkt. 54, ¶ 135; Dkt. 66, ¶ 135].  Wells Fargo also terminated the employment of five women of color at the Valley Mall branch where Janet Smith worked: Karima Lewis, who is black, and four Hispanic women (names unknown).  [Dkt. 57-12 (Opp'n Mot. Summ. J. Ex. 10, Smith Aff.), ¶ 10].

### d.  *Plaintiff's Application for Promotion*

Robertson applied to several Sales Manager 2 positions in 2013, which was a higher level of management than her role as Service Manager.  [Dkt. 54-3, at 125:2-22; Dkt. 54, ¶ 96; Dkt. 66, ¶ 96].  Robertson believes she qualified to apply for the Sales Manager 2 because she "made Bronze," but she did not know if her sales *performance* was sufficient to qualify for a Sales Manager 2 position.  [Dkt. 54-3, at 152:17-153:3].  The record indicates that Robertson interviewed with Bertsos for one Sales Manager 2 position, but she was not hired; she subsequently did not receive interviews for other applications she submitted. [Dkt. 54, ¶¶ 103-105; Dkt. 66, ¶¶ 103-105].

One such application where Robertson did not get an interview was for a position in Bruneau's district, and Bruneau ultimately hired Ashley Lanosa, a Hispanic woman who Robertson believes to have been on maternity leave at the time she received the position.  [Dkt. 54-3, at 126:4-6, 128:24-129:6; Dkt. 54-1, ¶ 37].  Robertson later learned from the recruiter Cheryl Samoha that Bruneau did not want to interview Robertson because she did not have "great sales skills." [Dkt. 54-3, at 127:1-18].  Bruneau states he chose not to interview her for two reasons: (1) he understood that Robertson had previously applied to a Store Manager 2 position in another district and was not selected; and (2) he believed her sales performance was not developed to the level necessary for a promotion. [Dkt. 54-1, ¶ 37].  For another such application, the Greater New Haven District Manager hired Mark Stanley.  [Dkt. 54, ¶ 105; Dkt. 66, ¶ 105].

On September 26, 2013, Robertson emailed and called Human Resources stating that she did not get two interviews and wanting feedback for her future applications.  [Dkt. 54, ¶¶ 102, 106; Dkt. 66, ¶¶ 102, 106].  Human Resources Consultant Regina Kay spoke with Robertson about her request for feedback. Kay then investigated the issue; her notes indicate at the one interview Robertson herself had revealed she "had min exposure on the platform side and needed more development for the role."  [Dkt. 54-20 (Def.'s Local Rule 56(a)(1) Statement Ex. 20, Kay HRA Notes), at RWF000173].[4]   Kay communicated this information to Robertson on October 7, 2013.  [Dkt. 54, ¶114; Dkt. 66, ¶ 114].

---

[4] Plaintiff objects to this statement as hearsay within hearsay.  *See* Fed. R. Evid. 805.   The Court finds that such evidence is admissible under the business records exception.  *See* Fed. R. Evid. 803(6).  The Court also notes that "platform" is the location where personal bankers work and "selling" occurs.  [*See* Dkt. 54, ¶ 111; Dkt. 66, ¶ 111].

Kay's notes also state the following: "Did not interview [Robertson] for other positions due to the first interview and the outcome of the interview.  Did not feel they needed to continue to interview [Robertson]."  [Dkt. 54-20, at RWF000173]. Subsequent to Robertson reaching out to Human Resources, Bruneau "told [her] that going forward . . . he expected that if [she] have a problem [she] would come to him."  [Dkt. 54-3, at 245:25-246:3].

Lanosa subsequently left the Town Plot position, so Robertson applied again on October 21, 2013.  [Dkt. 54, ¶117; Dkt. 66, ¶ 117].  Bruneau interviewed her on November 12, 2013, "in light of her communications with Human Resources about not being interviewed," but he ultimately hired Daniel Shea on November 19, 2013, because he viewed him to be more qualified and it had already been decided that Robertson's employment would be terminated.  [Dkt. 54-1, ¶ 45-46].  Robertson offers no evidence that at the time of this last interview she had acquired the important platform experience.

II.    Legal Standard

Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no genuine factual disputes exist.  *See Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).  In addition, determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment, as such are within the sole province of the jury.  *Hayes v. New York City Dep't of Corr.,* 84 F. 3d 614, 619 (2d Cir. 1996).

"In order to defeat a summary judgment motion that is properly supported by affidavits, depositions, and documents as envisioned by Fed. R. Civ. P. 56(e), the opposing party is required to come forward with materials envisioned by the Rule, setting forth specific facts showing that there is a genuine issue of material fact to be tried."  *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).  A plaintiff may not rely solely on "the allegations of the pleadings, or on conclusory statements, or on mere assertions that affidavits supporting the motion for summary judgment are not credible.  *Id.* (internal citations omitted).  "At the summary judgment stage of the proceeding, [a plaintiff is] required to present admissible evidence in support of her allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch– Rubin v. Sandals Corp.,* No. 3:03CV481 (MRK), 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (citing *Gottlieb*, 84 F.3d at 518); *see Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon

whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

### III.    <u>Analysis</u>

#### a. <u>*Discrimination on the Basis of Race and Gender*</u>

Robertson claims she was subjected to disparate treatment on the basis of her membership in a protected class. *See* 42 U.S.C. § 2000e-2(a)(1).  Title VII prohibits employment discrimination on the basis of race, color, religion, sex, and national origin. *Id.*  CFEPA similarly proscribes employment discrimination based on race and gender.   Conn. Gen. Stat. § 46a-60(a)(1).   The statutes employ slightly different language but are read coextensively. *State v. Comm'n on Human Rights and Opportunities,* 211 Conn. 464, 470 (1989).  The claims are evaluated under the three-part, burden-shifting standard set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Preston v. Bristol Hosp.*, 645 F. App'x 17, 19 (2d Cir. 2016). "Under this framework, a plaintiff must first establish a *prima facie* case of discrimination." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (citation omitted).  "The burden of proof that must be met to permit an employment discrimination plaintiff to survive a summary judgment motion at the prima facie stage is *de minimis*." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).  "Once a plaintiff meets this initial burden, the burden then shifts to the defendant to offer a legitimate non-

discriminatory reason for the termination." *Ruiz*, 609 F.3d at 492 (citation omitted). If the defendant offers a legitimate non-discriminatory reason for the termination, "the burden returns to the plaintiff to show that the real reason for plaintiff's termination was his race and national origin." *Id.* (citation omitted).

A plaintiff may bring a claim under a combination of two protected grounds of Title VII, such as race and gender, because "where two bases of discrimination exist, the two grounds cannot be neatly reduced to distinct components." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 109 (2d Cir. 2010) (addressing an age-plus-gender discrimination claim). "[A] plaintiff's discrimination claims may not be defeated on a motion for summary judgment based merely on the fact that certain members of a protected class are not subject to discrimination, while another subset is discriminated against based on a protected characteristic shared by both subsets." *Id.* Specifically with respect to black women,

> Black females represent a significant percentage of the active or potentially active labor force. In the absence of a clear expression by Congress that it did not intend to provide protection against discrimination directed especially toward black women as a class separate and distinct from the class of women and the class of blacks, we cannot condone a result which leaves black women without a viable Title VII remedy. If both black men and white women are considered to be within the same protected class as black females for purposes of the McDonnell Douglas prima facie case and for purposes of proof of pretext after an employer has made the required showing of a legitimate, non-discriminatory reason for the adverse employment action, no remedy will exist for discrimination which is directed only toward black females.

*Jefferies v. Harris Cty. Cmty. Action Ass'n*, 615 F.2d 1025, 1032-33 (5th Cir. 1980); *see Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598 n. 10 (1999) (citing with approval *Jefferies*, 615 F.2d at 1032 ("[D]iscrimination against black females can

exist even in the absence of discrimination against black men or white women.")); *Craig v. Yale Univ. Sch. of Med.*, 838 F. Supp. 2d 4, 8-9 (D. Conn. 2011) (same).

    i. *Plaintiff's Employment Termination*

      1.  **Prima Facie Case**

   To establish a prima facie case of disparate treatment for employment termination, "a plaintiff must show that (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz*, 609 F.3d at 491-92 (citation omitted). The parties do not dispute that Robertson is a member of a protected class as a black woman, that she was qualified for her position as Service Manager, and that she suffered adverse employment actions when she was terminated.

   Evidence giving rise to an inference of discrimination includes (1) the employer's criticism of the plaintiff's performance in ethnically degrading terms; (2) invidious comments about others in the employee's protected group; or (3) the more favorable treatment of similarly situated employees not in the protected group. *See Chambers*, 43 F.3d at 37; *see also Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group."). "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in

comparable conduct." *Ruiz*, 609 F.3d at 493-94.  Employees do not need to be the exact same rank to be "similarly situated." *Gorzynski*, 596 F.3d at 109 n. 7.  The question of whether an employee is "similarly situated" to another is typically, but not always, a question of fact for the jury.  *See Graham*, 230 F.3d at 39; *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790-91 (2d Cir. 2007) (stating that while the "similarly situated" issue is generally a question for the jury, "this rule is not absolute and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met"); *Yang v. Dep't of Educ. of the City of New York*, No. 14-CV-7037 (SLT) (RLM), 2016 WL 4028131, slip op. at 8 (E.D.N.Y. July 26, 2016) (noting that the question is one of fact not appropriate for a motion to dismiss).

Robertson was similarly situated to Service Managers and Store Managers, but a reasonable jury could not find that Robertson was similarly situated to tellers.  Robertson submitted an affidavit stating that 50% of her primary duties were spent in "non-management responsibilities," including acting "as necessary teller and lead teller functions."  [Dkt. 66-3, ¶ 12].  She also states her role as Service Manager was evaluated on the "same factors as tellers: customer service, absences, transaction errors, familiarity with products and services and meeting team goals."  [*Id.* ¶ 13].  The latter conclusory statement is unsubstantiated as Robertson has not provided the Court with any employment evaluation forms or other evidence suggesting the evaluations were the same for tellers and managers.  Furthermore, Robertson testified in her deposition that tellers were *her direct reports* and that it was her responsibility to make sure they were

20

complying with Wells Fargo policies.  [Dkt. 54-3, at 26:6-11, 36:9-13].  The Court finds that Robertson's affidavit is an impermissible attempt to create a "sham issue of fact," for a party may not submit an affidavit that contradicts a deposition.  *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014); *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.").

Even though Robertson often performed teller duties, her role as the direct supervisor of all tellers in the branch and her admission that it was her responsibility to make sure they were complying with Wells Fargo policies is dispositive of the issue of whether they are comparators.  This is true not only because of her status but more importantly because of her admitted managerial responsibilities.  [Dkt. 54-3, at 26:6-11, 36:9-13]. The tellers who participated with Robertson in submitting referrals – two white females and one male – received written warnings instead of being terminated, because Kent and Cox determined they acted under Robertson's supervision.  [*See* Dkt. 54-10, ¶ 18; Dkt. 54-16, ¶ 9]. In order to overcome a motion for summary judgment Robertson must show that the situation between herself and the tellers is so similar that it supports an inference that the difference in treatment is attributable to discrimination. *Khan v. Bank of Am., N.A.*, 572 F.Supp.2d 278, 291 (N.D.N.Y. 2008), aff'd, 372 F. App'x. 216 (2d Cir.2010) (unpublished opinion).  One of the key factors in establishing that a co-worker is a comparator is that the co-worker was subject to the same

workplace standards. *Graham v. Long Island R.R.*, 230 F.3d at 40.   A supervisor and a subordinate are nearly rarely similarly situated, and Robertson is no exception to this general principle. This principle is particularly true where the conduct at issue is conduct over which the supervisor had oversight.   Where a supervisor is charged with the responsibility of managing their subordinate consistent with the employer's policies and procedures, their responsibilities diverge.  By definition a supervisor is not a comparator of her subordinate where, as here, the supervisor is charged with assuring the subordinate's adherence to corporate policies because they are held to different standards.   Moreover, a supervisor cannot be a comparator of a subordinate who she suborns to violate the very policies she is charged with administering.  In so doing, the supervisor abuses her power over the subordinate and puts the subordinate in the untenable position of either being insubordinate to the direct supervisor and placing his or her job and job prospects in jeopardy or becoming a whistleblower in an attempt to preserve their position, with all the risk that entails.   Robertson was not similarly situated to tellers and thus she has not sustained her burden of presenting a triable issue on her disparate treatment claim.

The evidence does not support a finding that others similarly situated *outside* the protected class were treated any different.   The record indicates that one Asian American female, one white male, two black females, and one Hispanic female manager in the district were fired for submitting "unearned referrals. [Dkt. 54, ¶ 135; Dkt. 66, ¶ 135; Dkt. 57-12, ¶ 10].   The evidence simply shows that Wells Fargo terminated employees who were found to have violated the company

policies irrespective of their protected class status.   While the record also indicates that one black female and four Hispanic female tellers who did not report to Robertson were terminated, the evidence does not include any details about their employment at Wells Fargo from which the Court can determine whether they were comparators of Robertson.  [*See* Dkt. 57-12, ¶ 10].  A former Service Manager, Janet Smith, a black female teller, who was terminated for submitting "unearned referrals," stated in her affidavit that a lead teller from her branch, who is a white woman, was promoted despite participating in "unearned referrals."  [Dkt. 57-12, ¶ 11].   This claim is speculative as Smith does not aver that she has personal knowledge wither that the teller was in fact submitting "unearned referrals," or that her employers knew of this fact.   In addition, Smith offers no other facts about this individual from which a jury could conclude that she was similarly situated to Robertson.

## 2.  Non-Discriminatory Intent

Supposing a plaintiff establishes a prima facie case, "the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the adverse employment action."  *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012).   Here, Wells Fargo stated it terminated Robertson for the nondiscriminatory reason that she violated the company's sales referral policy and suborned her subordinates to do the same, conduct for which Robertson and her subordinates could receive unearned compensation and performance ratings. Robertson submitted a handwritten statement stating, "Mamta and I came to what I believe was a feasible solution that if a teller had six or more warm hand offs in

a day and the bankers did not uncover or closed [sic] those deal [sic] that we could give them a referral that I or Mamta uncover [sic] to encourage them to keep referring. . . ." [Dkt. 54-13].   The Code states, "Only valid sales referrals made by the team member seeking the credit may be submitted to meet sales goals or receive credit under sales incentive programs."   [Dkt. 54-2, at WF000020].  A violation of the Code is "grounds for corrective action, which may include termination of . . . employment."  [*Id.* at WF000014].

The Court need not decide whether Robertson's particular actions are explicitly listed as "inappropriate" in the Sales Quality Manual.[5]  At the very least, they clearly constitute the conduct broadly prohibited in the 2013 Handbook.  [*Id.* at WF000020 ("Gaming is defined as the manipulation, misrepresentation, or both or sales or sales reporting in an attempt to receive compensation or to meet sales goals," and gaming "to receive compensation, to meet sales goals, or for any other reasons is in direct violation of the company policy and this Code.")].  Moreover, Robertson admitted that it is inappropriate for a team member to enter a sale and assign it to another team member who did not make the sale.[6]  [Dkt.

---

[5] The "inappropriate" conduct listed in the Sales Quality Manual are as follows: "(1) Submitting a referral after directing a customer who came into the store with the intent to purchase a product or service, even if other products or services are discussed before the customer is directed to the banker. (2) Bankers supplying tellers with customer information to input as a referral when the teller did not have any contact with the customer. (3) Resubmitting a referral without having an additional sales conversation and without regaining consent from the customer. (4) Receiving referral credit for yourself or any other store personnel (e.g., a teller cannot refer another teller to a banker for referral credit). (5) A teller submitting a referral after translating for a customer or banker without uncovering a need for a product or service. (6) Entering teller referrals for customer seen at a *Wells Fargo At Work* offsite event."

[6] Plaintiff attempts to create a genuine issue of fact as to whether she violated company policy by arguing, "Another teller, Sara Farimani, told Mr. Alexander

54-3, at 56:1-5].   Her conduct was therefore punishable by employment termination, and as such Wells Fargo had a non-discriminatory reason taking such actions.

### 3. Pretext

If the employer cites a proper explanation for the adverse employment action, the plaintiff must show pretext. *Ruiz*, 609 F.3d at 492.  "Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more."  *Chambers*, 43 F.3d at 38 (internal quotation marks and citations omitted); *Lifranc v. New York City Dep't of Educ.*, No. 07-CV-1109 (KAM) (LB), 2010 WL 1330136, at *10 (E.D.N.Y. Apr. 6, 2010) (stating a plaintiff may survive summary judgment "through direct, statistical, or circumstantial evidence as to whether the employer's reason for its decision to discharge is false and as to whether it is more likely that a discriminatory reason motivated the employer to make an adverse employment decision") (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994)).  The ultimate question on summary judgment is whether "the employee's admissible evidence [ ] show[s] circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's

that plaintiff did not tell her or any teller to enter a referral from another teller." [Dkt. 57 (Pl.'s Opp'n Mot. Summ. J.), at 24 (citing Dkt. 57-9, at WF000178].  In fact, the Exhibit states, "The writer asked [Farimani] if Robertson ever told her to enter a referral for another team member and she said no.  She said she never heard her say that.  The writer asked Farimani if Robertson ever told her to submit a referral for a customer that she did not speak to and uncover a need.  She said that Robertson never told her, but she did overhear her say it to other tellers." [Dkt. 57-9, at WF000178].  The Court thus disregards Plaintiff's argument, which misrepresents the facts.

employment decision was more likely than not based in whole or in part on discrimination." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).

Robertson fails to demonstrate that her termination for a violation of the Code of Ethics constitutes pretext. A plaintiff may not establish pretext through mere speculation, and there is no evidence to suggest Kent and Cox decided to terminate her employment on the basis of her race and gender. *See Crawford-Mulley v. Corning Inc.*, 194 F. Supp. 2d 212, 220 (W.D.N.Y. 2002) ("This is simply a case of a person who disagrees with the reasons articulated for her failure to obtain a certain position, one for which she failed to submit any formal application."). In fact, Kent and Cox submitted affidavits stating they did not know Robertson's race when they decided to terminate her employment. [Dkt. 54-10, ¶ 16; Dkt. 54-16, ¶ 7]. Robertson attempts to create a genuine issue of fact by referring to Kent's post-investigation meeting notes wherein she stated, "Jeff says he wants to add this…both the [Store Manager] and [Service Manager] have called HRA and both are over 40. I said I hear you, and agree we need to look always at risk… but in this case, as leaders you need to know how to lead your team and saying you don't know what a valid referral is…I'm not buying." [Dkt. 54-15, at WF000125]. It is mere speculation to assume that an individual's knowledge of an employee's age necessarily means that person is aware of her race. Therefore, the Court DISMISSES the Title VII and CFEPA claims with respect to Plaintiff's allegations of unlawful termination.

ii. *Failure to Promote Plaintiff*

To establish a prima facie case of disparate treatment for failure to promote, a plaintiff must show "(1) that [s]he belonged to a protected class; (2) that [s]he was qualified for the position [s]he sought; (3) that [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251–52 (2d Cir. 2014).

As aforementioned, Robertson satisfies the first element because she is a member of a protected class. She also satisfies the third element because failure to promote is considered an adverse employment action under Title VII. *See Terry v. Ashcroft*, 336 F.3d at 138-39; *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'") (emphasis added); *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998) (determining that to establish an adverse employment action an employee requesting a promotion must apply for a specific position and be rejected rather than generally request a promotion). The key questions are whether she satisfies the second and fourth elements.

Wells Fargo argues that Robertson was not qualified for the position of Sales Manager 2, a promotion for which she applied on several occasions through Wells Fargo's internal application process. Bruneau determined that Robertson was not qualified for a Sales Manager 2 position because she had

27

minimal experience in the "platform" (i.e. selling) side and she needed more time to develop into the role. [Dkt. 54-20, at RWF000173].   Although Robertson believes she passed the necessary requirements in order to submit an application by virtue of her "Bronze" status, she admitted that she did not actually know whether her performance qualified her for the position.  [*See* Dkt. 54-3, at 152:17-153:3].

For reasons similar to those regarding Robertson's employment termination, there is no evidence to suggest that Robertson's employers acted with discriminatory intent.  There is no evidence that an employer at any point in the process criticized her in ethnically degrading terms or made invidious comments about others in her protected group.  *See Chambers*, 43 F.3d at 37. Furthermore, Robertson has not provided any evidence speaking to the skills, performance abilities, or even general qualifications of the promoted individuals (one Hispanic woman and two men).   The Court therefore can make no determination that these individuals received any sort of favorable treatment. *See id.*

The Court finds that an employer's determination that an employee needs time to develop sales skills is a valid non-discriminatory purpose.  It is also a valid reason not to interview and promote Robertson, because Wells Fargo already decided to terminate her, a factor relevant to Bruneau's decision regarding the Sales Manager 2 position vacated by Lanosa.  [*See* Dkt. 54-1, ¶ 46].[7]

---

[7] Kent's notes do not indicate the date when she notified Bruneau that he must terminate Robertson's employment.  [*See* Dkt. 54-15, at WF000125-26].  Rather, the documentation simply indicates she, Cox, and Alexander agreed on November 6, 2013, that Robertson should be terminated and that they would set

Robertson has provided no evidence to challenge the credibility of this evidence, and as such the Court GRANTS summary judgment in favor of the Defendant on this issue.

>   **b.  _Retaliation Claim_**

The Court will not exercise supplemental jurisdiction over Plaintiff's CFEPA retaliation claim and therefore dismisses it without prejudice.

### IV.   Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.  The Clerk is directed to close this file.

IT IS SO ORDERED.

_____**/s/**_____
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut:  January 23, 2017**

---

up a call with legal and update "HRBP."  [_Id._].  Notwithstanding the lack of documentation about the date when Bruneau was notified, the Court finds that there is no reason to challenge his credibility on this issue in light of the fact that Plaintiff provides no evidence to suggest otherwise and that he also determined Shea to be more qualified than Plaintiff.